**Sharla VAN CLEVE, Plaintiff,**

**v.**

**SOCIETY OF ST. VINCENT DE PAUL, Particular Council of the City of Dubuque, d/b/a Society of St. Vincent De Paul, Defendant.**

**No. C03–1019.**

United States District Court, N.D. Iowa, Eastern Division.

Dec. 30, 2004.

Douglas Q. Davis, II, James M. Heckmann, James M. Heckmann Law Offices PC, Michael J. Coyle, Fuerste, Carew, Coyle, Juergens & Sudmeier, PC, Dubuque, IA, for Plaintiff.

Francis J. Lange, Lange & Neuwoehner, Dubuque, IA, for Defendant.

### ORDER

JARVEY, United States Magistrate Judge.

This matter comes before the court pursuant to defendant's October 15, 2004 motion for summary judgment (docket number 31). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The plaintiff, Sharla Van Cleve, claims that the defendant (her former employer), Society of St. Vincent De Paul, Particular Council of the City of Dubuque, discriminated against her on the basis of her gender, in violation of both Title VII and Iowa Code Chapter 216. The plaintiff also claims that she was retaliated against as a result of her filing an administrative complaint with the Dubuque Human Rights Commission. Defendant has moved for summary judgment on both of plaintiff's claims, arguing that the plaintiff cannot, as a matter of law, establish a prima facie case of either discrimination or retaliation. The defendant further argues that the plaintiff has not and cannot produce any evidence that the defendant's proffered legitimate reasons are pretext either for gender discrimination or unlawful retaliation. The court disagrees. Defendants' motion for summary judgment is denied.

### SUMMARY JUDGMENT

A motion for summary judgment may be granted only if, after examining all of the

evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *Kegel v. Runnels,* 793 F.2d 924, 926 (8th Cir.1986). Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which it will bear the burden of proof at trial, there are genuine issues of material fact." *Noll v. Petrovsky,* 828 F.2d 461, 462 (8th Cir. 1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prod., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983)).

The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1110 (8th Cir.2001). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Id.* Although it has been stated that summary judgment should seldom be granted in employment discrimination cases, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case. *Helfter v. UPS, Inc.,* 115 F.3d 613, 615–16 (8th Cir.1997). The standard for the plaintiff to survive summary judgment requires only that the plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence did not directly contradict or disprove defendant's articulated reasons for its actions. *O'Bryan v. KTIV Television,* 64 F.3d 1188, 1192 (8th Cir.1995). To avoid summary judgment, the plaintiff's evidence must show that the stated reasons were not the real reasons for the plaintiff's discharge and that sex or other prohibited discrimination was the real reason for the plaintiff's discharge. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting the district court's jury instructions).

### STATEMENT OF MATERIAL FACTS [1]

At all relevant times, Paul J. Hoppman ("Hoppman") held the office of President

---

1. Where disputed, the facts are set forth in the light most favorable to the plaintiff as the nonmoving party. The plaintiff is advised, however, that its blanket assertion that it "disputes the context, implication and conclusions ... of Defendant's Statement of Undisputed Facts" does not comply with LR 56.1(b)(2) which requires that a party resisting a motion for summary judgment separately file "[a] response to the statement of material facts ... in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact." Along this same vein, both parties are advised to consult and follow the local rules with respect to brief format and length in general. *See e.g.,* LR 10.1(b)(1) (requiring that all filings be double spaced); LR 7.1(g) (providing that reply briefs not exceed five pages absent court-granted leave to file an overlength brief for good cause shown per LR 7.1(h)); LR 7.1(i) (which provides that all briefs comply with the requirements of LR 10.1); LR 56.1(d) (requiring that reply briefs conform with LR 7.1(g)); LR 56.1(a) (requiring that each individual statement of material

and served as a volunteer Chief Executive Officer on the defendant's board of directors. The plaintiff began working for the defendant as a sales clerk on January 29, 1990 and later worked in the warehouse. In August of 1993, Bob Ruden (Ruden) was promoted to director of operations. In 1997, the defendant moved its warehouse to a building on the west side of Dubuque and opened a thrift store in that same building. Ruden became director of both the previously existing downtown store and the new westside store and warehouse. In the fall of 1997 the plaintiff was appointed as the westside store supervisor and paid $6.00 per hour. The plaintiff had limited supervisory experience prior to her being promoted. In December of 1999, the plaintiff was appointed as warehouse manager, in addition to being the westside store manager, although she received no extra compensation.[2] Shortly after plaintiff was appointed as the manager of the westside store and warehouse, she discovered that Hoppman wanted a man in the job. He said on occasions in front of employees that "women shouldn't be in management positions." Hoppman also commented that "that's why we need a guy in charge," when the plaintiff conflicted with anyone in the warehouse. Around this same time, in 1999, the plaintiff and Hoppman disagreed as to the ap-

propriate measure of discipline for a male employee accused of stealing thousands of dollars of merchandise from the defendant and reselling it on the internet. The plaintiff voiced her opinion that the man should be fired, but Hoppman disagreed, referring to the male employee, who was a truck driver for the defendant, as an essential employee. Following this disagreement, the plaintiff felt that Hoppman's attitude toward her changed for the worse. Shortly after this incident, Barb McDonald, another employee of the defendant's, asked Hoppman why the man had not been fired immediately. Hoppman did not answer. McDonald then asked what would have happened to her if she had been caught stealing. Hoppman replied that she would have been fired at once because she is a woman.

At the January 13, 2003 board meeting, it was voted that the plaintiff be removed from her salaried status and be paid the same corresponding hourly wage for a 40-hour work week, and that she not be given a raise. Hoppman claimed to be unaware that the plaintiff had ever been made a salaried employee, alleging this was done by Ruden without board input or approval. The plaintiff claims in rebuttal that Hoppman was present at a store committee meeting where the plaintiff's status as a

---

fact contain citations to the appendix). Future filings not complying with the local rules may be stricken. *See* LR 5.1(b) (providing that the judge may order that papers which do not comply with the Local Rules not be filed).

**2.** Defendant denies that the plaintiff was ever given the duties or title of warehouse manager, although the record indicates that no separate warehouse manager was hired after Reuben Balk left in 1999 and Hoppman held plaintiff responsible for the OSHA and fire code violations in the warehouse, among other problems. *See* Defendant's Appendix at 5 ("Legitimate reasons that the Board discussed at its January, 2003 meeting included the

following events or occurrences during the time. Ms. Van Cleve *managed* the Radford Road store and *warehouse:* the store was cited by the Fire Department for many violations of the City Fire Code the Society was cited by IOSHA for several violations of fire and safety code.... The January 24, 2003 memorandum had nothing to do with Sharla Van Cleve's sex or any 'discriminatory animus,' on the part of Paul Hoppman, 'toward Plaintiff's sex,' and it was based on a consensus and vote of Defendant's Board Members at a January, 2003 meeting, after that Board had reviewed and identified problems with the *management* of the westside store and *warehouse.*") (quoting defendant's answer to interrogatory number 8) (emphasis added).

salaried employee was discussed. On January 14, 2003, Hoppman directed Ruden to inform the plaintiff of the board's action in returning her to an hourly employee and restricting her duties to the sales floor, with no warehouse responsibilities, and no responsibility for hiring or firing employees at the westside store. The change in the plaintiff's wage status became effective on January 21, 2003. Hoppman also directed Ruden to hire a separate warehouse manager.

At the February 10, 2003 board meeting, Bob Ruden presented a letter he had written to the District Counsel, wherein he praised the plaintiff's abilities and outlined the recent changes in her employment, i.e, she could no longer hire and/or fire employees, she was changed to an hourly employee, which would result in lost income to the plaintiff, and she was relieved of her warehouse management duties. At this same meeting, one of the council members thought she heard a comment to the effect that "Sharla Van Cleve doesn't have to be paid as much because her husband makes good money." [3]

On February 18, 2003 the plaintiff filed an administrative complaint with the Dubuque Human Rights Commission, alleging gender and race discrimination. On March 14, 2003, Hoppman appointed Terry Thompson, who already worked for the defendant as a truck driver, to be the warehouse manager. Ruden did not support Thompson's appointment, referring to Thompson as a "pathological liar" whom he did not trust. Thompson was being paid $10.10 per hour as a truck driver for the defendant at the time of his promotion. The plaintiff was making $9.37 per hour at the same time for managing both the west-side store and warehouse. Thompson was promised a retroactive raise to $13.00 per hour after six months if he was doing a good job. To Hoppman's recollection, the plaintiff never received a similar offer, which is consistent with the plaintiff's claim that she never received such an offer. Thompson was also provided health insurance and had been since he began employment with the defendant on May 24, 1989. The plaintiff was never offered health insurance. Thompson was later provided a raise in salary in lieu of health insurance. No female employee was provided a raise at that time. Thompson's appointment was announced to the west side store employees on March 14, 2003. On March 17, 2003 an employee meeting was held, conducted by Hoppman. It was at this meeting that the plaintiff was informed for the first time that she was being held responsible for various OSHA violations, fire code violations, and decreased sales. Also at this meeting Hoppman claimed to be in possession of more than 20 complaints about the plaintiff and the westside store/warehouse and made the following comment regarding the plaintiff's civil rights complaint: "[W]hen you called Human Rights and told them I discriminate and am racist, that's when you made this personal." Throughout her employment with the defendant, the plaintiff had never received a job description or an employment evaluation.

The plaintiff filed an amended complaint with the Dubuque Human Rights Commission on March 20, 2003, claiming Thompson's appointment, which stripped her of the warehouse management duties she had been performing for the last six years, was done in retaliation for her filing the initial

3. The identify of the speaker of this comment, assuming it was made, is not apparent from the cited deposition, although the plaintiff attributes this comment to Hoppman in her administrative complaint and brief. Because there is no evidence in the record before the court demonstrating that Hoppman did, in fact, make this comment, the court will not consider it as such for summary judgment purposes.

civil rights complaint. Specifically, the plaintiff had her warehouse keys taken away from her, was forbidden from going into the warehouse except to clock in/out and for breaks, was directed to have no verbal contact with Thompson, was denied access to the store computer and surveillance system, and had her desk searched and personal items removed. Furthermore, throughout the summer of 2003, Hoppman required that the plaintiff telephone him at home to report when she left for and returned from lunch. No other employees were required to do this.

The plaintiff was denied access to the warehouse after Hoppman decided that she was to blame for the ongoing "donnybrooks" between her and Thompson. Hoppman assigned fault for the "donnybrooks" to the plaintiff after listening to Thompson's version of events, but never asked for nor allowed the plaintiff to tell her side of the story, as he felt it was not necessary.

Hoppman was upset that the plaintiff had filed her complaints with the Dubuque Human Rights Commission, and made those feelings clear to the board. Carr, a board member, testified that, in his opinion, the plaintiff was relieved of some of her duties, had her pay decreased, and her duties restricted, as a result of her filing her civil rights complaint. Carr further testified that Hoppman made it clear to the board of directors that he [Hoppman] felt that the plaintiff should not have filed her complaint with the Dubuque Human Rights Commission.

In April of 2003, the plaintiff and her co-worker, Sue Thomas, were written up after a confrontation with a customer who Thomas had witnessed changing price tags and combining individually priced merchandise under one price tag. Thomas initially confronted the man and called the plaintiff for help after the situation escalated. Ultimately, the plaintiff asked the man to leave the store and he did. Apparently the customer complained to Hoppman, who ordered Ruden to take disciplinary action against Thomas and the plaintiff. Both women were written up and given a verbal warning. Hoppman spoke neither to Thomas or the plaintiff regarding the incident before ordering the disciplinary action and the women's request to review the surveillance tapes of the incident was refused.

The plaintiff took a leave of absence from her job in mid-July 2003 and returned in September 2003. This leave was at her doctor's recommendation as a result of work-related stress. She quit her employment with the defendant in October 2003.

## CONCLUSIONS OF LAW

### Gender Discrimination

The defendant argues that it is entitled to summary judgment on plaintiff's gender discrimination claim. Specifically, the defendant claims that the plaintiff was not qualified to manage both the west side store and warehouse, was not satisfactorily fulfilling the warehouse supervisor position, and its relieving her of that job and restricting her job duties in various other respects was a result of her poor performance, not her gender. Likewise, the defendant argues that its reduction of plaintiff's wages was a result of inadvertence, not gender discrimination. The plaintiff contends that her gender discrimination claim presents genuine issues of fact for trial.

### Applicable Analytical Framework

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual, with respect to his [or her] compensation, terms, conditions, or privileges of employ-

ment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Title VII also prohibits an employer from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3. Discrimination and retaliation claims are analyzed either under the *Price Waterhouse* direct evidence framework or the *McDonnell Douglas* indirect evidence or burden-shifting framework. The defendant argues that the *McDonnell Douglas* analysis is appropriate as there is no direct evidence of either discrimination or retaliation. The defendant characterizes Hoppman's comments as "stray remarks." The plaintiff counters that Hoppman's comments constitute direct evidence of both discrimination and retaliation, making the *Price Waterhouse* framework applicable. Alternatively, the plaintiff contends that Hoppman's comments, coupled with the other, circumstantial evidence of discrimination and retaliation, suffice to get her case before a jury.

"Stray remarks" are "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276–77, 109 S.Ct. 1775, 104 L.Ed.2d 268 (O'Connor, J., concurring). The Eighth Circuit Court of Appeals has defined direct evidence as "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision." *Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 634–35 (8th Cir. 1998) (quotations omitted). Comments

demonstrating a discriminatory animus in the decisional process, or those uttered by individuals closely involved in the decisionmaking process may constitute direct evidence as defined by *Price Waterhouse. Beshears v. Communications Servs., Inc.*, 930 F.2d 1348, 1354 (8th Cir.1991).

■ Hoppman was undeniably a decisionmaker and was closely involved in the decisionmaking process. His comments relevant to the plaintiff's gender discrimination claim include him saying on occasions in front of employees that "women shouldn't be in management positions" and "that's why we need a guy in charge." The time frame of these comments is not entirely clear from the record, but the plaintiff does not specifically allege that any of these comments were made anywhere near January 13, 2003, when the board of directors voted to return the plaintiff to an hourly employee and deny her a raise. Hoppman also told Barb McDonald, another female employee, that she would have been fired at once if she had been caught stealing merchandise because she is a woman. This comment was not made to the plaintiff and was made in or around 1999, some four years prior to the plaintiff's duties being restricted. Based on the record provided to the court, for summary judgment purposes, the court concludes that Hoppman's remarks do not constitute direct evidence of gender discrimination. As such, the plaintiff's gender discrimination claim will be analyzed under the *McDonnell Douglas* burden-shifting analysis.

*Application of McDonnell Douglas* [4]

There are three steps under the *McDonnell Douglas* indirect evidence framework: (1) prima facie case; (2) nondiscriminatory reason by the employer; and (3) pretext.

---

4. This is not to say that the jury will ultimately be given an "indirect evidence" instruction if the evidence at trial more directly links

Hoppman's comments to the plaintiff's adverse employment actions so as to warrant a mixed motive instruction.

*Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In order to do this, the plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that nonmembers of her class ... were not treated the same. *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999). Once the plaintiff establishes her prima facie case of employment discrimination, the burden then "shifts to the employer to demonstrate a legitimate nondiscriminatory reason for the adverse employment action." *Id.* "The employer need only articulate, not prove, its legitimate reason, because the employee continues to bear the burden of proving that he or she was subjected to unlawful discrimination." *Bauer v. Metz Baking Co.,* 59 F.Supp.2d 896, 908 (N.D.Iowa 1999) (citing *Walton v. McDonnell Douglas Corp.,* 167 F.3d 423, 427 (8th Cir.1999)). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 509, 113 S.Ct. 2742). To overcome the employer's proffered legitimate reason, the employee " 'must present affirmative evidence' " that discrimination was the real reason for the adverse employment action. *Bauer,* 59 F.Supp.2d at 909 (quoting *Walton,* 167 F.3d at 428).

■ Applying this framework to this case, the court must determine whether the plaintiff has established her prima facie case of discrimination. First, it is undisputed that the plaintiff is a member of a protected class. Second, taking the evidence in a light most favorable to the plaintiff, she was qualified to do her job. The plaintiff never received a negative employment evaluation, or any evaluation at all throughout her tenure with the defendant. Moreover, her direct supervisor, at least two board members, and some of plaintiff's coworkers testified that the plaintiff was performing well as the westside store and warehouse manager. The only negative performance "evaluation" the plaintiff received was at the March 17, 2003 employee meeting wherein Hoppman announced Thompson as the new warehouse manager and publicly blamed the plaintiff for various OSHA and fire code violations, as well as for the high employee turnover at the westside store and warehouse. Third, the plaintiff must show that she suffered an adverse employment action. "[A]n adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *LaCroix v. Sears, Roebuck & Co.,* 240 F.3d 688, 691 (8th Cir.2001); *see also Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) (holding that adverse employment action includes demotions and reductions in pay). Here, the plaintiff was relieved of her warehouse manager duties, including the responsibility for hiring and firing employees, she was no longer allowed to use the company computer, her warehouse keys were taken away, she was directed to call Hoppman at home when leaving for and returning from lunch, her net pay was reduced when she was reverted to an hourly employee, she was directed to communicate with the new warehouse manager only in writing, and she was denied a raise when all of the other employees were given one.[5] Sepa-

5. While it may be true that the pay decrease was inadvertent and unintentional, the defen-

rately and/or cumulatively, these actions qualify as adverse employment actions.[6] Finally, the plaintiff must show that non-members of her class were not treated the same. Her warehouse manager duties were given to a man who was paid more than the plaintiff and promised a retroactive raise after six months of good performance on the job. The court finds that the plaintiff has established her prima facie case of gender discrimination.

■ Because the plaintiff has established her prima facie case, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for its adverse employment action. The defendant has done so by claiming that the change in salary status and raise denial was not gender based, but rather was done only after Hoppman realized that the plaintiff had been made a salaried employee and given several raises without the board's knowledge or authorization. The defendant's allegation that plaintiff's performance as the warehouse manager was poor also satisfies defendant's burden of articulating a legitimate, non-discriminatory reason for its adverse employment action. Regarding the plaintiff's pay cut, the defendant claims inadvertence, i.e., the defendant merely intended to reduce plaintiff's salary to an hourly wage with no decrease in pay. According to the defendant, the pay decrease was a result of Ruden's math error in implementing the board's directive. The court finds that the defendant has met its burden.

■ Upon the defendant's showing of a legitimate, nondiscriminatory reason, the burden returns to the plaintiff to show that the reasons given by the defendant were not the true reasons behind her adverse employment actions, but were merely a pretext for gender discrimination. To demonstrate pretext, the plaintiff points to the fact that, despite the absence of performance evaluations, her direct supervisor, board member James "Skip" Carr, and several co-workers felt she was performing well in her job, and these alleged deficiencies in her job performance were brought to her attention only after she filed her complaint with the Dubuque Human Rights Commission. The plaintiff rebuts the defendant's claims of unauthorized raises and change in salary status by alleging that Hoppman was present at the meeting in 2001 where the plaintiff was made a salaried employee and Ruden's denial of giving unauthorized raises. Also relevant are Hoppman's anti-female comments made throughout the plaintiff's employment. *See Fisher v. Pharmacia & Upjohn,* 225 F.3d 915, 919 (8th Cir.2000) (finding stray remarks constitute circumstantial evidence that, when considered together with other evidence, may give rise to a reasonable inference of discrimination). The court finds that the plaintiff has presented a submissible case of gender discrimination. The factual disputes are for the jury to decide.

### Retaliation

■ Title VII prohibits employers from discriminating against an employee "be-

dant offers no explanation why this alleged oversight was not rectified immediately after Ruden brought it to the board's attention via his February 10, 2003 letter.

6. The plaintiff argues in her resistance that the culmination of the job restrictions made it so difficult for her to do her job that she was forced to seek mental health treatment and had to resign her position. According to the plaintiff, this constitutes a constructive discharge. In its reply, the defendant merely states that "there is a serious issue of fact as to whether Van Cleve suffered an adverse employment action." Whether the plaintiff was constructively discharged will be revisited at the close of plaintiff's case as it appears to be, at best, a marginal case of constructive discharge.

cause [s]he has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e–3. Plaintiff claims that Hoppman's comment at the March 17, 2003 meeting, i.e., "when you called Human Rights and told them I discriminate and am racist, that's when you made this personal" constitutes direct evidence of retaliation, making the *Price Waterhouse* analysis applicable. The defendant argues that Hoppman's comments are "stray remarks," unrelated to the decisions made affecting the plaintiff's employment. The court agrees with the plaintiff, although summary judgment would be improper under either *Price Waterhouse* or *McDonnell Douglas*. Under *Price Waterhouse*, once the plaintiff introduces direct evidence of retaliation, the burden then shifts to the employer to show, by a preponderance of the evidence, "that it would have made the same decision even if it had not taken the plaintiff's [complaint] into account." *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775.

The defendant argues that the actions taken with respect to the plaintiff's employment were decided upon *before* she filed her complaint with the Dubuque Human Rights Commission, and merely implemented afterward, thereby demonstrating that the plaintiff's discrimination complaint played no role whatsoever in its decision. This is partially true. On January 13, 2003 the board voted to return the plaintiff to an hourly employee and not give her a raise. On January 21, 2003, Ruden prepared a memo for Hoppman's signature outlining the changes in the plaintiff's employment, i.e., she was relieved of her hiring and firing responsibilities, she was returned to an hourly employee, and her duties were limited to the sales floor. On January 25, 2003, the

defendant posted a "Notice of *Possible Future Job Opening*" which provides that the defendant is "currently looking at the possibility of filling a position of warehouse supervisor." The notice is further qualified by the statement: "This is only an inquiry as to interest in such a position, should this position be established in the future. (This is not a job offer or posting)." On February 10, 2003, the board was notified via Ruden's letter that their decision to revert the plaintiff to an hourly employee resulted in lost monies to her. The board took no corrective action.[7] The plaintiff filed her administrative complaint on February 18, 2003. On March 14, 2003, Hoppman gave Ruden four directives, to be implemented on March 17, 2003. Included in these directives is the preparation of a job description for Terry Thompson, who was being appointed warehouse supervisor, as well as the directive that:

> Sharla Van Cleve is to have nothing to do with warehouse operations. Sharla Van Cleve $5 [sic] not to be in the warehouse at all. Sharla Van Cleve is to remove sign on Radford Court store entrance door asking that donations be taken to warehouse entrance door, also place clothing rack inside entrance door for donated clothing.

On March 17, 2003, at the employee meeting, Hoppman told the plaintiff that she "made it personal" when she went to the Dubuque Human Rights Commission and "called [him] racist." On or around June 3, 2003, Hoppman issued the following memo to the plaintiff:

> Due to reports of harassment and intimidation, *until further written notice from me*, the only time you are to be in the warehouse is to clock in and clock out

---

7. The defendant's offer to rectify this as part of a Dubuque Human Rights Commission me-   diation is irrelevant.

and at your break periods and lunchtime in the break room. You are not to have any contact with Terry, our Warehouse Manager. Any communication that you need to do with him will be done with memos.

Any violation of this order will result in serious disciplinary action, including termination.

Paul Hoppman, President

It was also after the plaintiff filed her administrative complaint that Hoppman required that she telephone him at home upon her leaving for and returning from lunch. The ball may have been rolling prior to the plaintiff filing her administrative complaint, but it did nothing but pick up steam afterward. The defendant's explanation for its actions, i.e., that the plaintiff was disruptive and harassing Thompson does not explain the March 14, 2003 directive, which was given before Thompson was even on the job. The defendant's failure to get the plaintiff's side of the story before banishing her from the warehouse also renders the defendant's explanation somewhat suspect. The factual disputes and inferences to be drawn therefrom are for the jury to decide. Defendant's motion for summary judgment with respect to plaintiff's retaliation claim is denied.

Upon the foregoing,

IT IS ORDERED that the defendant's motion for summary judgment (docket number 31) is denied.